## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:10cv258

| | | |
|---|---|---|
| GLEN EDWARD CHAPMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| DENNIS ALVIN RHONEY, in his | ) | |
| individual capacity, ROBERT A. | ) | |
| MULLINAX, as Public Administrator | ) | |
| of the ESTATE OF MARK | ) | |
| RICHARDSON SAMS, in his individual | ) | |
| capacity, and  CITY OF HICKORY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court are Defendants' Motions to Dismiss [# 17 & # 19].

Plaintiff brought this action against the City of Hickory (the "City") and two of its

former police officers in their individual capacities.   Specifically, the Complaint

asserts two federal claims pursuant to 42 U.S.C. § 1983 and a claim for obstruction

of justice under North Carolina law.   The claims all arise out of the criminal

investigation and subsequent conviction of Plaintiff for the 1992 murders of Betty

Jean Ramseur and Tenene Yvette Conley.   Defendants move to dismiss the Complaint

in its entirety.   The Court **RECOMMENDS** that the District Court Grant in part and

Deny in part the Defendants' Motions to Dismiss [# 17 & # 19].

## I.     Background

### A.     The Parties to this Dispute

Plaintiff is a resident of Buncombe County, North Carolina.  (Pl.'s Compl. ¶ 28.)  Defendant Dennis Alvin Rhoney was a police officer for the City from 1984 through 1997.  (<u>Id.</u> at ¶ 39.)  Mark Richardson Sams was a police officer for the City from 1983 through 1994.  (<u>Id.</u> at ¶ 44.)  Officer Sams died in 2009.  (<u>Id.</u> at ¶ 42.)  Defendant Robert A. Mullinax is the duly appointed Public Administrator of the Estate of Officer Sams.  (<u>Id.</u> at ¶ 41.)  Plaintiff brought this action against Officer Rhoney and the Estate of Mark Richardson Sams (the "Estate") in their individual capacities.  (<u>Id.</u> at ¶¶ 55-58.)  Plaintiff also named the City of Hickory as a defendant to this action based on the allegations that Officers Rhoney and Sams were acting as agents of the City within the scope of their employment when the alleged wrongful acts occurred. (<u>Id.</u> at ¶ 61.)

### B.     The Criminal Investigation into the Murder of Betty Jean Ramseur

In 1992, two men discovered the partly skeletonized human remains of Betty Jean Ramseur in the open crawl space underneath an abandoned, partially burnt home in Hickory, North Carolina. (<u>Id.</u> at ¶ 65.)  Several bones were missing.  (<u>Id.</u>)  Ramseur was last seen on June 11, 1992, leaving the courthouse with a black male.  (<u>Id.</u> at ¶ 106.)  The Medical Examiner determined that Ramseur died in June 1992 from blunt

trauma to the head.  (Id. at ¶ 72.)  The Hickory Police Department assigned Officer Rhoney as the lead detective in the Ramseur investigation. (Id. at ¶ 74.)

Officer Rhoney knew that the fire that partially destroyed the house where Ramseur's body was discovered occurred on June 12, 1992, because he was one of two officers to respond to the scene when the fire occurred.  (Id. at ¶¶ 107, 109.) Alvin Creasman witnessed the fire and told the officers that the night before the fire he noticed a black male and a white female in the house.  (Id. at ¶¶ 107-108.)  Another officer present at the scene made handwritten notes in the file connected with the investigation of the fire, which  described the male Creasman saw as a 5'6" - 5'7" tall, 130-135 pound black male.  (Id. at ¶¶ 114, 116.)  Creasman described the female as a 5'4" - 5'5" tall, 110 pound white female.  (Id. at ¶ 116.)   Plaintiff was 5'9" tall and weighed 165-170 pounds at the time.  (Id. at ¶ 118.)  Although Officer Rhoney was aware of the description of the individuals Creasman saw was contained in the file, Plaintiff contends that Officer Rhoney intentionally withheld this information from the prosecution in order to prevent Plaintiff from using this evidence at trial.  (Id. at ¶¶119-20.)

Three days after being assigned lead detective, Officer Rhoney interviewed Nicole Cline, who told him that Plaintiff came to her home the first week of July 1992 and stated that he had killed Ramseur and put her body in the basement of the house

where the Mayfields used to live. (Id. at ¶¶ 75-6.) Ms. Cline, however, stated that she did not believe Plaintiff because he appeared to be impaired and mad at someone, and that he often admitted to doing things that he had never actually done. (Id. at ¶ 77.) After interviewing Ms. Cline, Officer Rhoney concluded that Plaintiff murdered Ramseur. (Id. at ¶ 78.) Accordingly, he considered Plaintiff the only suspect in the murder and focused his investigation on Plaintiff. (Id. at ¶ 79.)

Officer Rhoney then interviewed Ms. Cline's brother, Brian Cline. (Id. at ¶ 80.) Mr. Cline told Officer Rhoney that in July 1992, Plaintiff told him that "if people didn't quit [f—ing] with him that he was going to kill them and put them under that house like he did that white girl." (Id. at ¶ 81.) Mr. Cline, like Ms. Cline, stated that he did not believe Plaintiff, and that Plaintiff was mad at someone. (Id. at ¶ 82.)

The day after Officer Rhoney interviewed Mr. Cline, law enforcement officers discovered Ramseur's abandoned vehicle in the parking lot of the J&W Cafeteria in Hickory. (Id. at ¶ 89.) Through subsequent investigation, Officer Rhoney learned that on June 18, 1992, two individuals found Ramseur's car in the parking lot of a warehouse near the home where her body was found. (Id. at ¶ 90.) The car was unlocked, the keys were on the floorboard, and Ramseur's purse was in plain view. (Id.) These individuals then stole the car and drove it around with two other individuals. (Id.) One of the individuals then burned the purse and its contents, wiped

down the car, and left it in the parking lot of the J&W. (Id.)

Approximately a week later, Officer Rhoney received a telephone memo instructing him to return a call from Richard Allen, who had overheard a conversation in jail regarding Ramseur. (Id. at ¶ 92). Officer Rhoney interviewed Allen by telephone the next day. (Id. at ¶ 94.) Allen told Officer Rhoney that while he was in the Catawba County jail he overheard a conversation between E.R. Frazier - one of the individuals who had stolen Ramseur's car - and another male. (Id. at ¶ 95. ) Allen reported that Frazier stated that while he was using cocaine with a thin white girl, he choked her and "'[w]hat I done with her, I thought they would never find her unless they tore the damn house down.'" (Id. at ¶ 96.) Defendant Rhoney responded that the police already had a suspect and a good handle on the Ramseur investigation. (Id. at ¶ 97.) Defendant Rhoney jotted down a few notes of the conversation, including the name E.R. Frazier, on the back of the telephone memo. (Id. at ¶ 98.) Plaintiff contends that Officer Rhoney intentionally withheld the telephone memo and the information gathered during this call from the prosecutor so that Plaintiff's counsel could not use this evidence at trial. (Id. at ¶103.) In addition, Plaintiff alleges that Officer Rhoney either destroyed or failed to prepare a supplemental report from this interview. (Id. at ¶ 104.)

A second fire occurred at the home where Ramseur's body was found on

November 14, 1992. (Id. at ¶ 130.) Subsequently, another officer interviewed Lavar Gilliam, a fourteen year old being held at the Swananoa Juvenile Evaluation Center, in connection with the investigation of the second fire. (Id. at ¶ 134.) Gilliam told this officer that he overheard Plaintiff tell people that he killed a girl that got on his nerves, and that he told people that he needed to go back and burn the body or burn the whole house down so there would not be any evidence. (Id. at ¶ 135.) This officer told Officer Rhoney about Gilliam's statement and submitted a supplemental report of the interview. (Id. at ¶ 137.) Ramseur's remains, however, were found approximately two months prior to the second fire. (Id. at ¶ 138.) Plaintiff alleges that Defendant Rhoney withheld the report of the interview from the prosecution because it impeached Gilliam's credibility. (Id. at ¶¶ 138-140.)

Finally, on December 23, 1992, Officer Rhoney brought Creasman to the police department in order to identify the black male he saw the morning of the fire. (Id. at ¶ 121.) He showed Creasman six photographs, including a photo of Plaintiff. (Id. at ¶ 122.) Creasman identified an individual other than Plaintiff, which was memorialized in a one-page document signed by Creasman and Officer Rhoney. (Id. at ¶¶ 123-25.) Defendant Rhoney did not provide this document to the prosecution and destroyed the photographs that Creasman was shown. (Id. at ¶¶ 126-28.)

### C. The Criminal Investigation into the Murder of Tenene Yvette Conley

On August 15, 1992, the body of Tenene Yvette Conley was found in the basement of a vacant home in Hickory, North Carolina. (Id. at ¶ 149.) The Medical Examiner determined that Conley died from manual strangulation. (Id. at ¶ 154.)

The Hickory Police Department assigned Officer Sams as the lead investigator in the Conley investigation. (Id. at ¶ 155.) During his investigation, two individuals reported seeing Plaintiff and Conely walking in the direction of the house where Conley's body was discovered during the early morning hours of August 14, 1992. (Id. at ¶ 156.) A DNA analysis also revealed that sperm in Conley's vaginal area belonged to Plaintiff. (Id. at ¶ 157.) Based upon these two pieces of information, as well as his knowledge of the Ramseur investigation, Officer Sams considered Plaintiff the only suspect. (Id. at ¶¶ 158-59.)

The day that Conley's body was discovered, Lieutenant Merle Hamilton interviewed Mike Crosby, who lived with Conley at the time. (Id. at ¶ 172.) Crosby told Lieutenant Hamilton that he had seen Conley around 10:30 a.m. on August 14, 1992, and that the last time he saw her she was getting into a car with Billy Hull and George Reinhardt the evening of August 14, 1992. (Id. at ¶ 173.) Crosby also stated that Conely had stolen a ring from Hull and sold it to buy cocaine. (Id.) Finally, Crosby stated that he had not seen Hull or Reinhardt since the discovery of Conley's body. (Id.) Lieutenant Hamilton typed a report of this interview, which he shared

with Officer Sams. (Id. at ¶ 174.) Plaintiff contends that Officer Sams intentionally withheld this report from the prosecution. (Id. at ¶ 176.)

Approximately two weeks later, Officer Sams conducted his own interview of Crosby. (Id. at ¶ 177.) Crosby told Officer Sams that Conely had stolen a ring from Billy Hull, which she sold to buy drugs. (Id. at ¶ 178.) Crosby also stated that Gene Robinson saw Conley get into the car with Hull and Reinhardt the evening of August 14, 1992. (Id. at ¶¶ 178-79.) Officer Sams took handwritten notes during this interview, which incorrectly indicates that Robinson saw Conley getting into the car on August 13, 1992, rather than August 14, 1992. (Id. at ¶ 181.) Subsequently, Officer Sams prepared a typewritten report of the interview to produce to the prosecution. (Id. at ¶ 182.) Plaintiff alleges that Officer Sams intentionally omitted Crosby's statements implicating Hull as a suspect, as well as Crosby's statement that Robinson saw Conley alive on the evening of August 14, 1992. (Id.) Officer Sams also failed to turn over his handwritten notes and the report prepared by Lieutenant Hamilton to the prosecution. (Id. at ¶ 187.)

On September 2, 1992, Sergeant Dan Carlsen of the Hickory Police Department interviewed one of Conley's friends, Carl Geter. (Id. at ¶ 189.) Geter told Sergeant Carlsen that he had heard that Hull and Reinhardt killed Conley, and that they had been with her on the evening of August 14, 1992. (Id. at ¶ 190.) Sergeant Carlsen

reported this information to Officer Sams fifteen minutes later. (Id. at ¶ 191.)

Subsequently, Sergeant Carlsen prepared a typewritten report, which he provided to

Officer Sams, stating:

> Carl Dennis Geter advised that he had heard that Billy Cort Hull and Ice Man had Tenenee Conley killed . . .
>
> Geter stated that Billy Cort Hull and Ice Man were with Tenenee the day before she was found. That Billy Cort Hull and Ice Man had a third unknown B/M with them described as being dark skinned, 170 lbs., 5'9', mustache, and a little beard or goatee on the chin area. The third B/M is the one who killed Tenenee. That the unknown B/M had bought four rocks of crack cocaine from one of the local dope dealers and had given Tenenee a couple of rocks. The unknown B/M then wanted to have sex with Tenenee and Tenenee did not want to give him any and he started beating her.

(Id. at ¶¶ 192-93.) Officer Sams then prepared a report to provide to the prosecution.

(Id. at ¶ 194.)   This report, however, omitted the statements regarding Conley's

refusal to have sex with the unknown male and stated that Conley was seen with Hull

and Reinhardt on the evening of August 12, 1992, rather than August 14, 1992. (Id. at

¶¶ 195-97.)   Officer Sams did not produce Sergeant Carlsen's report to the

prosecution. (Id. at ¶ 199.)

### D.    The Indictment of Plaintiff in the Murders of Ramseur and Conley

Officer Rhoney had a warrant for arrest issued for Plaintiff for the murder of

Ramseur on December 23, 1992. (Id. at ¶ 141.) Plaintiff was arrested approximately

a week later. (Id. at ¶ 142.) A Grand Jury indicted Plaintiff in early January 1993.

(Id. at ¶ 143.)  Officer Rhoney was the only person to testify before the Grand Jury. (Id. at ¶ 144.)

Subsequently, the Grand Jury indicted Plaintiff for the murder of Conley. (Id. at ¶ 203.)  Officer Sams was the only person to testify before the Grand Jury. (Id. at ¶ 204.)  Plaintiff pled not guilty to both charges, although he admitted to having sexual intercourse with Conley on the evening of August 13, 1992.  (Id. at ¶¶ 145, 205-06.)

After the Grand Jury indicted Plaintiff for the murder of Conley, Officer Sams left the Hickory Police Department.  (Id. at ¶ 161.)  Officer Rhoney was then appointed lead investigator in the Conley investigation.  (Id. at ¶ 208.)  After becoming lead investigator, Officer Rhoney reviewed the investigative file.  (Id. at ¶ 209.) Plaintiff contends that during this investigation, Officer Rhoney discovered that Officer Sams had failed to produce exculpatory evidence to the prosecution, but that he intentionally decided to continue withholding this information.  (Id. at ¶¶ 209-211.)

**E.    Plaintiff's Prosecution for the Murders of Ramseur and Conley**

The State of North Carolina prosecuted Plaintiff for the murders of Ramseur and Conley.  Prior to trial, counsel for Plaintiff filed a Motion for Production of

Exculpatory Evidence pursuant to <u>Brady v. Maryland</u> in both cases. (<u>Id.</u> at ¶ 214.) In response, the Assistant District Attorney informed Plaintiff's counsel that all exculpatory evidence in the prosecution's files had been produced. (<u>Id.</u> at ¶ 215.) As Plaintiff concedes, the statement by the Assistant District Attorney was correct because Officers Rhoney and Sams allegedly withheld the exculpatory evidence from the prosecution. (<u>Id.</u> at ¶ 216.) Plaintiff alleges that Officers Rhoney and Sams intentionally withheld this information from the prosecution. (<u>Id.</u> at ¶¶ 216-18.)

The state trial judge joined the two cases for trial. (<u>Id.</u> at ¶ 221.) Officers Rhoney and Sams both testified at trial. (<u>Id.</u> at ¶ 225.) Plaintiff contends that because of the intentional conduct of Officers Rhoney and Sams in failing to produce exculpatory evidence to the prosecution, Plaintiff's counsel was unaware of this evidence and could not use it at trial. (<u>Id.</u> at ¶ 241.) On November 10, 1994, the jury convicted Plaintiff of first-degree murder in both cases and recommended that the Court sentence Plaintiff to death in each case. (<u>Id.</u> at ¶¶ 226-27.) The trial judge then imposed sentences of death. (<u>Id.</u> at ¶ 228.) Plaintiff contends that he was convicted and imprisoned because of the fact that Officers Rhoney and Sams intentionally withheld exculpatory evidence, and that he would likely either have been acquitted or never prosecuted had the officers produced this evidence. (<u>Id.</u> at ¶¶ 247-48.)

After the North Carolina Supreme Court affirmed Plaintiff's conviction and

death sentences, and the United States Supreme Court denied Plaintiff's petition for a writ of certiorari, Plaintiff filed a Motion for Appropriate Relief in State Court. (Id. at ¶¶ 249-253.)  After a series of evidentiary hearings, Superior Court Judge Robert C. Ervin granted Plaintiff's motion on November 6, 2007, finding that Plaintiff was entitled to a new trial on a number of grounds, including that the State failed to disclose exculpatory evidence in violation of Brady.  (Id. at ¶¶ 253-256.)  Judge Ervin also found that Officer Rhoney testified falsely at trial about his interactions with Creasman and allowed the State to offer false evidence and make false arguments in violation of Napue v. Illinois, 360 U.S. 264 (1959).  (Id. at ¶ 257.)  Subsequently, the Catawba County District Attorney dismissed the murder charges against Plaintiff on April 2, 2008, and Plaintiff was released from prison.   (Id. at ¶¶ 258-259.)  Plaintiff then brought this action against Officers Rhoney and Sams and the City on November 3, 2010.  Defendants move to dismiss pursuant to F.R.C.P. 12(b)(6).

## II.    Legal Standard

The central issue for resolving a Rule 12(b)(6) motion is whether the complaint states a plausible claim for relief.  See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009).  In considering a defendant's motion, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir.

2009); Giacomelli, 588 F.3d at 190-92. Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ." Consumeraffairs.com, 591 F.3d at 255; see also Giacomelli, 588 F.3d at 189.

The complaint need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007); see also Consumeraffairs.com, 591 F.3d at 256. "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S. Ct. at 1965. Nor will mere labels and legal conclusions suffice. Id. Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. ____, 129 S. Ct. 1937, 1949 (2009).

The complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; see also Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. ____, 129 S. Ct. at 1949; see also Consumeraffairs.com, 591 F.3d at 255. The mere possibility that

the defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claims from possible to plausible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; Consumeraffairs.com, 591 F.3d at 256.

### III.    Analysis

### A.    The Section 1983 Claims

In the first claim for relief, Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Officers Rhoney and Sams in their individual capacity based on their alleged violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In short, Plaintiff contends that by intentionally withholding exculpatory evidence in bad faith, Officers Rhoney and Sams deprived Plaintiff of his liberty without due process of law. In the second claim for relief, Plaintiff alleges that the City is liable pursuant to Section 1983 because it condoned a custom of allowing its police officers to withhold exculpatory evidence from the prosecution in violation of the Fourteenth Amendment. Defendants move to dismiss the claims on several grounds.

### 1.    The statute of limitations

Although Section 1983 provides a plaintiff with a federal cause of action, courts

look to state law for determining the statute of limitations for such a claim. <u>Wallace v. Kato</u>, 549 U.S. 384, 387, 127 S. Ct. 1091, 1094 (2007). Accordingly, courts apply the statute of limitations for state personal-injury torts to Section 1983 claims. <u>Id.</u> In North Carolina, the statute of limitations for Section 1983 actions is three years. <u>Love v. Alamance Cnty. Bd. of Educ.</u>, 757 F.2d 1504, 1506 (4th Cir. 1985). The accrual date of a Section 1983 claim, however, is a question of federal law. <u>Wallace</u>, 549 U.S. at 388, 127 S. Ct. at 1095; <u>Brooks v. City of Winston-Salem, N.C.</u>, 85 F.3d 178, 181 (4th Cir. 1996).

Here, Plaintiff's Section 1983 claims accrued when the state criminal proceedings terminated in his favor. <u>See</u> <u>Brooks</u>, 85 F.3d at 183; <u>see also</u> <u>Snider</u>, 584 F.3d at 199. "Because § 1983 actions seeking damages for unconstitutional arrest or confinement imposed pursuant to legal process-claims most analogous to the common-law tort of malicious prosecution-must allege and prove a termination of the criminal proceedings favorable to the accused, such claims do not accrue until a favorable termination is obtained." <u>Brooks</u>, 85 F.3d at 183. In fact, if Plaintiff had brought a Section 1983 claim prior to this date, it would have been subject to dismissal. <u>See</u> <u>Heck v. Humphrey</u>, 512 U.S. 477, 484-87, 114 S. Ct. 2364, 2371-2373 (1994). Plaintiff brought this action within three years of the termination of the criminal proceedings in his favor. The Section 1983 claims, therefore, are not time-barred. The

Court **RECOMMENDS** that the District Court deny the Motions to Dismiss the Section 1983 claims on statute of limitations grounds.

<u>2.     The individual capacity Section 1983 claims against Officers Rhoney and Sams</u>

Officers Rhoney and Sams contend that they are entitled to qualified immunity as to the Section 1983 claims asserted against them in their individual capacity.  The doctrine of qualified immunity protects government officials from civil liability in Section 1983 actions provided that the officials' conduct does not violate a clearly established constitutional right.  <u>Doe v. S.C. Dep't of Soc. Servs.</u>, 597 F.3d 163, 169 (4th Cir. 2010); <u>Snider v. Lee</u>, 584 F.3d 193, 198 (4th Cir. 2009).  Qualified immunity presents a two-pronged inquiry.  <u>S.C. Dep't of Soc. Servs.</u>, 597 F.3d at 169.  In the context of a motion to dismiss, Courts should grant government officials qualified immunity unless: (1) the plaintiff alleges facts that make out a violation of a constitutional right; and (2) the constitutional right at issue was "clearly established" when the alleged misconduct occurred.  <u>Id.</u>

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty , or property, without due process of law."  U.S. Const. amend. XIV, § 1.  In <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), the United States Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Although Brady dealt with the duty of the prosecution to turn over certain evidence, Courts, including the United States Court of Appeals for Fourth Circuit, have recognized that in certain circumstances, a police officer who withholds exculpatory information from a prosecutor can also be liable under Section 1983 for a violation of due process. See Jean v. Collins, 221 F.3d 656, 659 (4th Cir. 2000) (collecting cases); Carter v. Burch, 34 F.3d 257, 264 (4th Cir. 1994); see also Brady v. Dill, 187 F.3d 104, 114 (1st Cir. 1999); Walker v. City of New York, 974 F.2d 292, 298-99 (2nd Cir. 1992); Yarris v. Cnty. of Del., 465 F.3d 129, 141 (3rd Cir. 2006); Hart v. O'Brien, 127 F.3d 424, 446-47 (5th Cir. 1997); Geter v. Fortenberry, 882 F.2d 167, 171 (5th Cir. 1989); Moldowan v. City of Warren, 578 F.3d 351, 381-382 (6th Cir. 2009); Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir. 1988); McMillian v. Johnson, 88 F.3d 1554, 1567-68 (11th Cir. 1996).

While the Fourth Circuit has not laid out the specific parameters of an officer's duty to disclose evidence, a plaintiff bringing a Section 1983 claim against an officer must, at a minimal, allege that the officer: (1) intentionally withheld exculpatory evidence from the prosecution; (2) which resulted in a wrongful criminal conviction; (3) that is subsequently overturned pursuant to a Brady violation; and (4) the officers

acted in bad faith.  <u>See</u> <u>Jean</u>, 221 F.3d at 663.  Here, the Complaint sets forth sufficient

factual allegations supporting a claim that Officers Rhoney and Sams are liable under

Section 1983 for depriving Plaintiff of his liberty without the due process of law.  The

Complaint alleges with great detail that Officers Rhoney and Sams intentionally

withheld exculpatory evidence from the prosecution so that Plaintiff's counsel could

not use this evidence as trial.  Plaintiff alleges that Officers Rhoney and Sams witheld

this evidence in bad faith, and that it was not the result of mistake or negligence.

Subsequently, Plaintiff was wrongly convicted of murdering two individuals, and  the

State Court then overturned his convictions based, in part, on a <u>Brady</u> violation.

Accordingly, the Complaint sets forth factual allegations stating a claim for the

deprivation of Plaintiff's right to due process.

The more difficult question, however, is whether this constitutional right was

clearly established at the time the alleged wrongs occurred - 1992 through 1994.  A

right is "clearly established" where "[t]he contours of the right [are] sufficiently clear

that a reasonable official would understand that what he is doing violates that right."

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).  This

standard does not require a court to have previously held that the specific action in

question is unlawful.  <u>Id.</u>  Rather, the unlawfulness of the action must be "apparent"

in light of the law existing at the time.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct.

2508, 2515 (2002); <u>Anderson</u>, 483 U.S. at 640, 107 S. Ct. at 3039; <u>S.C. Dept. of Soc.</u> <u>Servs.</u>, 597 F.3d at 176. Ordinarily, a district court need not look beyond decisions of the United States Supreme Court, the United States Court of Appeals for the Fourth Circuit, and the North Carolina Supreme Court. <u>Id.</u>; <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 251 (4th Cir. 1999). "In analyzing the applicability of the qualified immunity defense, [the court] lastly consider[s] whether a reasonable person in the official's position would have known that his conduct would violate that right." <u>Edwards</u>, 178 F.3d at 251.

The Fourth Circuit recognized as early as 1964 that the prosecution's failure to turn over exculpatory evidence, even where it had no knowledge of the evidence because the investigating officers failed to disclose it to the prosecution, violated a criminal defendant's due process rights. <u>Barbee v. Warden, Md. Penitentiary</u>, 331 F.2d 842, 846 (4th Cir. 1964). Subsequently, the Fourth Circuit recognized that the investigating officer could be held liable under Section 1983 for the failure to disclose exculpatory evidence because the non-disclosure deprives a criminal defendant of his or her right to a fair trial. <u>Goodwin v. Metts</u>, 885 F.2d 157, 163 (4th Cir. 1989). This aspect of the holding in <u>Goodwin</u> was not affected by the Supreme Court's ruling in <u>Albright v. Oliver</u>, 510 U.S. 266, 114 S. Ct. 807 (1994). <u>See</u> <u>Taylor v. Waters</u>, 81 F.3d 429, 436 n.5 (4th Cir. 1996). Moreover, two months before Plaintiff was convicted

of murder, the Fourth Circuit noted that an officer's failure to turn over exculpatory evidence to the prosecution violated the criminal defendant's constitutional rights. Carter, 34 F.3d at 264.[1] And the Fourth Circuit was not alone in recognizing this right. See e.g. Moldowan, 578 F.3d at 381-82 (collecting cases). As the Sixth Circuit explained in Moldowan, "the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." Id. at 382.

At the time the alleged suppression of exculpatory evidence by Officers Rhoney and Sams occurred, a reasonable officer in their position would have know that intentionally failing to disclose exculpatory evidence to the prosecution violated Plaintiff's constitutional rights. Accordingly, the Court finds that the constitutional right at issue in this case was clearly established for purposes of applying the doctrine of qualified immunity. Officers Rhoney and Sams, therefore, are not entitled to qualified immunity from civil liablity from Plaintiff's Section 1983 claims. The Court **RECOMMENDS** that the District Court deny the Motion to Dismiss as to the Section 1983 claims against Officers Rhoney and Sams.

     3.     The Section 1983 claims against the City

---

[1]The Court is not persuaded that the unpublished opinion Walker v. Sopher, 164 F.3d 627, 1998 WL 682283 (4th Cir. 1998), dictates a different result.

In order to hold a municipality liable for a constitutional violation pursuant to Section 1983, a plaintiff must demonstrate that the violation was caused by an official custom or policy of the municipality.  Martin, 355 F.3d at 782; Walker v. Prince George's Cnty., MD, 575 F.3d 426, 431 (4th Cir. 2009).  "[A] municipality cannot be held liable simply for employing a tortfeasor."  Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 522 (4th Cir. 2000).  As the United States Court of Appeals for the Fourth Circuit explained in Riddick:

> Because section 1983 was not designed to impose municipal liability under the    doctrine of respondeat superior, the "official policy" requirement was "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."

Riddick, 238 F.3d at 523 (quoting Pembaur v. City of Cincinnati 475 U.S. 469, 479, 106 S. Ct. 1292, (1986)); see also Spell v. McDaniel, 824 F.2d 1380, 1396-87 (4th Cir. 1987).

Although in the rare case municipal policymakers may adopt an official policy directly authorizing unconstitutional police conduct that is itself unconstitutional, a plaintiff will usually have to establish municipal liability by demonstrating something other than direct authorization by policymakers.  See Spell, 824 F.2d at 1388-89.  Accordingly, the Fourth Circuit has recognized two basic theories for imposing

liability on a municipality where "fault and causation cannot be laid to a municipal policy 'itself unconstitutional.'" Id. at 1389. First, a plaintiff can establish liability by demonstrating a deficient program of police training and supervision that results in a constitutional violation committed by untrained or improperly trained police officers. Id. Second, a plaintiff can demonstrate an "irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example." Id. The requirements for establishing either of these theories of liability based on police misconduct are necessarily stringent in order to avoid inadvertently attaching a form of vicarious liability to the municipality. Id. at 1391; Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).

Here, Plaintiff does not allege that the City policymakers adopted an official policy condoning or authorizing the alleged unconstitutional actions by Officers Rhoney and Sams that caused his injuries. Instead, Plaintiff alleges that the City "condoned the custom at the Police Department of withholding exculpatory evidence from the prosecution." (Pl.'s Compl. ¶ 289.)

In order to set forth a Section 1983 claim against a municipality based on the theory that it condoned a custom or usage of unconstitutional conduct, a plaintiff must first allege an unconstitutional practice on the part of police officers that is sufficiently

persistent and widespread as to have the force of law. <u>Spell</u>, 284 F.2d at 1286-1391; <u>Randall v. Prince George's Cnty. Md.</u>, 302 F.3d 188, 210 (4th Cir. 2002). This custom or usage may then form the basis of municipal liability where a plaintiff can also demonstrate actual or constructive knowledge of the existence of the custom or usage by responsible policymakers, and that the policymakers acted with deliberate indifference or the specific intent not to correct or stop the custom or usage. <u>Spell</u>, 284 F.2d at 1391. "Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." <u>Id.</u> A close casual link must exist between the known but uncorrected custom and the specific constitutional violation. <u>Id.</u>

The Complaint states a valid claim for relief against the City based on a theory that it condoned a custom of allowing its police officers to withhold exculpatory evidence from the prosecution in order to avoid having to produce this evidence to a criminal defendant's counsel. The Complaint contains allegations that Officers Rhoney and Sams, as well as other officers, withheld exculpatory evidence on multiple occasions in accordance with the custom in existence at the Hickory Police Department. At this stage of the proceedings, the allegations in the Complaint are sufficient to infer knowledge on the part of the City, as well as that the City

policymakers acted with deliberate indifference or the specific intent not to correct or stop its officers from withholding exculpatory evidence from the prosecution. <u>See</u> <u>id.</u> at 1391. Accordingly, the Court **RECOMMENDS** that the District Court deny the City's Motion to Dismiss as to the Section 1983 claim.

## B. The State Law Claims

Plaintiff also asserts obstruction of public justice claims against each of the Defendants. Obstruction of justice is a common law offense in North Carolina. <u>Jones v. City of Durham</u>, 643 S.E.2d 631, 633 (N.C. Ct. App. 2007). "It is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." <u>Broughton v. McClatchy Newspapers, Inc.</u>, 588 S.E.2d 20, 30 (N.C. 2003). Plaintiff contends that Officers Rhoney and Sams are liable in their individual capacity for obstructing justice, and that the City is liable pursuant to theory of *respondeat suprior* for the acts committed by Officers Rhoney and Sams during the course and scope of their employment as police officers. (Pl.'s Compl. ¶¶ 298-301.)

The Defendants move to dismiss the obstruction of justice claims on several grounds. Officers Rhoney and Sams contend that the obstruction of justice claims are barred by public official immunity, the public duty doctrine, and the statute of limitations. Similarly, the City contends that the state law claim asserted against it is barred by the doctrine of sovereign immunity. Although the Court finds that the

obstruction of justice claims are barred by the applicable three year statute of limitations, the Court shall discuss each of the grounds pursuant to which Defendants move to dismiss the Complaint for the benefit of the District Court.

1.     The state law claims against Officers Rhoney and Sams

As a threshold matter, Defendants' reliance on the public duty doctrine is misplaced.  It is well settled that the public duty doctrine does not apply where the conduct of which a plaintiff complains constitutes an intentional tort.  See e.g., Smith v. Jackson Cnty. Bd. of Educ., 608 S.E.2d 399, 406 (N.C. Ct. App. 2005); Little v. Atkinson, 523 S.E.2d 378, 380-81 (N.C. Ct. App. 2000); Clark v. Red Bird Cab Co., 442 S.E.2d 75, 79 (N.C. Ct. App. 1994); Hollifield v. City of Hickory, 575 S.E.2d 75 (N.C. Ct. App. 2003) (unpublished). Plaintiff does not assert negligence or gross negligence claims against Defendants.  Rather, Plaintiff alleges that Officers Rhoney and Sams acted intentionally, as is required to state a claim for obstruction of justice. See Blackburn v. Carbone, 703 S.E.2d 788, 795 (N.C. Ct. App. 2010) (holding that a claim for common law obstruction of justice requires the showing of an intentional act of misconduct by the defendant).  Accordingly, the public duty doctrine does not support the dismissal of Plaintiff's obstruction of justice claims.

Defendants' reliance on public official immunity is equally without merit, as that doctrine does not apply where the official acts maliciously, corruptly, in bad faith,

willfully, or deliberately.  Meyer v. Walls, 347 N.C. 97, 112 (N.C. 1997);  Epps v.

Duke Univ., Inc., 468 S.E.2d 846, 851 (N.C. Ct. App. 1996).  An officer acts with

malice where he violates "clearly established rights." Bailey v. Kennedy, 349 F.3d 731,

742 (4th Cir. 2003).  Accepting the allegations in the Complaint as true, Officers

Rhoney and Sams intentionally withheld exculpatory evidence from the prosecution

in order to prevent Plaintiff's counsel from gaining access to this evidence, an act that

a man of reasonable intelligence would know to be contrary to his duty.[2]  Id.

Accordingly, Officers Rhoney and Sams may not rely on the doctrine of public officers

immunity at this stage of the proceedings.

Plaintiff's obstruction of justice claims, however, are barred by the statute of

limitations.  N.C. Gen. Stat. § 1-52(5) provides the applicable three year statute of

limitations.  An action for obstruction of justice, however, must be brought within three

years of the date it accrues, which is the date "when a plaintiff becomes aware or

reasonable should have become aware of the fraud or harm." Self v. Yelton, 688

S.E.2d 34, 38-39 (N.C. Ct. App. 2010).  Unlike Plaintiff's Section 1983 claim or a

malicious prosecution claim under North Carolina law, an obstruction of justice claim

does not have as one of its elements that the criminal proceedings terminate in the

favor of the plaintiff.  See Chidnese v. Chidnese, 708 S.E.2d 725, 731 (N.C. Ct. App.

---

[2]The Complaint also contains allegations supporting Plaintiff's contention that Officers
Rhoney and Sams acted in bad faith.

2011); <u>Gupton v. Son-Lan Dev. Co., Inc.</u>, 695 S.E.2d 763, 767 (N.C. Ct. App. 2010); <u>Brooks</u>, 85 F.3d at 183. Accordingly, Plaintiff's obstruction of justice claim accrued when he became aware of the harm caused by the alleged acts of Officer Rhoney and Sams, not when the two murder proceedings terminated in his favor. Because Plaintiff's obstruction of justice claims were brought more than three years after the date they accrued, these claims are barred by the applicable statute of limitations. The Court **RECOMMENDS** that the District Court grant the Motions to Dismiss as to the obstruction of justice claims.

> 2.     The state law claims against the City

Although the Court finds that the obstruction of justice claims as to all Defendants are barred by the statute of limitations, the Court will briefly address the City's remaining ground for dismissal for the benefit of the District Court in case it determines that the obstruction of justice claims did not accrue until Plaintiff's criminal conviction was set aside. The doctrine of sovereign or governmental immunity generally shields municipalities and their agents from being sued in their official capacity for torts committed during the course of performing a governmental function. <u>Owen v. Haywood Cnty.</u>, 697 S.E.2d 357, 359 (N.C. Ct. App. 2010); <u>Houpe v. City of Statesville</u>, 497 S.E.2d 82, 87 (N.C. Ct. App. 1998). Law enforcement constitutes a government function. <u>See Clayton v. T.H. Branson</u>, 570 S.E.2d 253, 257 (N.C. Ct.

App. 2002); <u>Houpe</u>, 497 S.E.2d at 87. "An officer acting in his official capacity shares the municipalities immunity or waiver." <u>Clayton</u>, 570 S.E.2d at 257.

A municipality may waive sovereign immunity by purchasing liability insurance. <u>Owen</u>, 497 S.E.2d at 87; <u>Houpe</u>, 497 S.E.2d at 87. The municipality, however, only waives immunity to the extent of coverage provided in the insurance policy. <u>Owen</u>, 497 S.E.2d at 87. "A plaintiff that has brought claims against a governmental entity and its employees acting in their official capacities must allege and prove that the officials have waived their sovereign immunity or otherwise consented to suit." <u>Id.</u>

The Complaint alleges that the City "waived its governmental immunity, pursuant to N.C. Gen. Stat. § 160A-485, by purchasing liability insurance for the state law claims alleged herein." (Pl.'s Compl. at ¶ 63.) This allegation of waiver is sufficient to overcome the City's motion to dismiss based on sovereign immunity. <u>See</u> <u>Efird v. Riley</u>, 342 F. Supp. 2d 413, 426 (M.D.N.C. 2004). Although the City attached a number of insurance polices to its Motion to Dismiss and moves this Court to interpret those policies in ruling on its motion, this Court may not consider extrinsic evidence at the motion to dismiss stage unless the document submitted with a defendant's motion to dismiss is integral to and explicitly relied upon in the complaint and plaintiff does not challenge the authenticity of the document. <u>Phillips v. LCI Int'l,</u> <u>Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999). The insurance policies submitted by the City

fail to satisfy this standard. Accordingly, the Plaintiff has statisfied his burden of pleading that the City has waived its sovereign immunity as to the claims at issue. The Court **RECOMMENDS** that the District Court deny the City's Motion to Dismiss on sovereign immunity grounds.

## IV. CONCLUSION

The Court **RECOMMENDS** that the District Court **DENY in part** and **GRANT in part** the Defendants' Motions to Dismiss [# 17 & # 19]. The Court **RECOMMENDS** that the District Court **GRANT** the Motions to Dismiss as to the obstruction of justice claims and **DENY** the motions as to the Section 1983 claims.

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must**

**be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).

Signed: August 3, 2011

Dennis L. Howell
United States Magistrate Judge